UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN L. LOBDELL,

|  |  |
|---|---|
| Plaintiff, | Civil Action No.: 14-10399 |
|  | Honorable Sean F. Cox |
| v. | Magistrate Judge David R. Grand |

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [15, 17]

Plaintiff Steven L. Lobdell ("Lobdell") brings this action pursuant to 42 U.S.C. § 405(g),

challenging a final decision of Defendant Commissioner of Social Security ("Commissioner")

denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act

(the "Act").  Both parties have filed summary judgment motions which have been referred to this

Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.      RECOMMENDATION

For the reasons set forth below, the Court finds that substantial evidence supports the

Administrative Law Judge's ("ALJ") conclusion that Lobdell is not disabled under the Act.

Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment

[17] be GRANTED, Lobdell's motion [15] be DENIED, and that, pursuant to sentence four of 42

U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

II.     **REPORT**

A.     **Procedural History**

On April 9, 2011, Lobdell filed an application for DIB, alleging disability as of January 27, 2011.  [Tr. 90-96].  The claim was denied initially on October 27, 2011.  [Tr. 53]. Thereafter, Lobdell filed a timely request for an administrative hearing, which was held on September 4, 2012, before ALJ Mary S. Connelly.  [Tr. 25-42].  Lobdell, represented by attorney Bruce Lighter, testified, as did vocational expert Toni McFarland.  [*Id*.].  On September 18, 2012, the ALJ found Lobdell not disabled.  [Tr. 8-24].  On November 27, 2013, the Appeals Council denied review.  [Tr. 1-6].  Represented by new counsel, Lobdell filed for judicial review of the final decision on January 28, 2014.  [1].

B.     **Background**

1.     *Disability Reports*

Lobdell was age 34 at the time he submitted a June 30, 2011 disability report.  [Tr. 117]. In that report, Lobdell alleged disability based on the following conditions: back, shoulder, and hip injury; anxiety; inability to bend, sit, stand or walk for long periods of time; and inability to raise his right arm.  [Tr. 117].  He stated that he completed the 12th grade, and had previously worked as a custodian, foreman, painter, stock person, and warehouse manager.  [Tr. 118].

Lobdell also completed a July 23, 2011 function report.  [Tr. 136-47].  In that report, he stated that he lives in a mobile home with his wife.  [Tr. 136].  He reported spending his day trying to find a comfortable position, and that his wife performs all household chores, including cooking and shopping.  [Tr. 137-139].  He reported having difficulty pulling up his pants, getting into the shower, sitting up and down, and that his pain is so significant that it often wakes him from sleep.  [*Id*.].  He stated that he goes outside only weekly because he experiences pain while

getting in and out of vehicles and while using stairs. [Tr. 139]. His hobbies include going to the movies, playing cards, watching television, playing games, and bowling. [Tr. 140]. In response to a question asking how often he engaged in those activities, Lobdell responded, "on weekends." [*Id.*]. He reported that friends visit for chats approximately twice a month, but indicated that he sometimes had difficulty getting along with others because his pain causes irritability. [Tr. 140-41]. He reported no difficulties with paying attention, following instructions, getting along with authority figures, or handling stress. [Tr. 141-42]. He also stated that he took Vicodin for pain relief, and used a back brace as necessary per his doctor's recommendation. [Tr. 142-43].

In a disability appeals report dated October 31, 2011, Lobdell reported that he was using several pain medications, a muscle relaxant, anti-anxiety medication, and blood pressure medication. [Tr. 152].

### 2.    Lobdell's Testimony

At the time of the administrative hearing, Lobdell was 36 years old. [Tr. 27]. He stated that his health issues resulted entirely from a 2010 car accident. [Tr. 30]. He alleged that he was taken to a hospital following the accident, but did not receive x-rays or significant treatment. [*Id.*]. However, he stated that later x-rays and body scans revealed problems with his hip. [Tr. 31]. Lobdell stated that pain in his back ranges between eight and nine out of ten, and that he experiences constant pain. [Tr. 32]. He also alleged that sitting or standing for more than 20 minutes causes extreme back pain, and that walking induces pain. [*Id.*]. Lobdell also stated that he sleeps on the couch so that he can easily rotate between sitting up and laying down every one to two hours. [Tr. 34].

Lobdell testified that he cannot comfortably lift more than ten pounds, and that bending

at the waist causes pain.  [Tr. 33].  He further complained that he cannot lift his right shoulder above his head, and experiences pain when stretching his right arm outward.  [*Id*.].  He stated that he takes pain pills four times daily, which help, but do not eliminate his pain.  [Tr. 34].  He also recounted taking high blood pressure medication and occasional muscle relaxers.  [*Id*.].  Lobdell also stated that he undergoes spinal injections every three months to relieve pain, though the relieving effects last for only approximately two weeks.  [Tr. 39].

Lobdell alleged that, since the accident, he has experienced unexplained swelling and peeling of his feet on three occasions.  [Tr. 35].  He reported elevating his legs at hip height "all the time."  [*Id*.].

Regarding his mental condition, Lobdell stated that he gets "real anxious in the car all the time," and that he takes medicine to reduce this problem.  [Tr. 35].  However, he described no problems with memory, concentration, or focus.  [*Id*.].

As to his activities of daily living, Lobdell testified that he sits on his couch and watches television most of the day, and occasionally visits relatives.  [Tr. 35-36].  He stated that he never goes shopping because of his pain, and he reaffirmed that he relies upon his wife to perform yard work, chores, and cooking.  [*Id*.].

Because of his pain, Lobdell alleged that he must lay down every several hours, supporting his back and legs with pillows, and thus would not be able to perform more than a few hours of work, even if permitted to sit and stand at will.  [Tr. 37].

### 3.    *Medical Evidence*

#### a.    *Treating Sources*

Lobdell visited Oakwood Hospital on March 2, 2010, for a physical examination and complaints of anxiety.  [Tr. 278-79].  Dr. Nijuanna Irby Johnson prescribed anti-anxiety

4

medication for use prior to interviews, and noted signs of high blood pressure and contact dermatitis or eczema. [*Id*.].

On September 23, 2010, Lobdell experienced a motor vehicle accident.[1] [Tr. 30]. Lobdell alleges that he sought medical treatment on the day of the accident, but no records from such a visit are available. [*Id*.]. Records do exist from a September 27, 2010 visit to Oakwood Hospital, where Lobdell was examined by Dr. David Szaraz. [Tr. 275-77]. Lobdell complained of aching, burning pain throughout his middle and lower back, in addition to swelling and peeling of both feet. [Tr. 275]. Dr. Szaraz noted muscle spasms of the lumbar spine and that Lobdell experienced moderate pain when moving. [*Id*.]. He also found that Lobdell displayed "[n]o unusual anxiety or evidence of depression." [*Id*.]. Dr. Szaraz attributed the swelling and peeling of Lobdell's feet to post-traumatic effects of the vehicle accident. [*Id*.].

Lobdell next visited Dr. Szaraz on October 1, 2010. [Tr. 271-74]. Dr. Szaraz found that Lobdell's back pain was relieved by pain medication, and aggravated by extension, flexion, and lifting. [Tr. 271]. He found that Lobdell's foot swelling was "much improved," with no evidence of edema. [*Id*.]. He noted muscle spasms in the cervical spine, thoracic spine, and lumbar spine, and recommended physical therapy. [Tr. 272-74].

Lobdell again visited Dr. Szaraz on October 22, 2010, who diagnosed him with lumbago. [Tr. 268-70]. Dr. Szaraz noted that Lobdell had not attended physical therapy because of unspecified "time constraints," and found that his foot condition had been fully resolved. [Tr. 269]. Dr. Szaraz also noted muscle spasms and a reduced range of motion in Lobdell's thoracic and lumbar spine. [*Id*.].

---

[1] While Lobdell asserts in his brief that the motor vehicle accident occurred on September 27, 2010 [15 at 2], several medical records indicate that the accident occurred on September 23, 2010. [Tr. 161, 169, 175, 275].

Nearly six months later, on March 8, 2011, Lobdell sought treatment at Quantum Physical Therapy, under the care of physical therapist Rachelle Borowicz. [Tr. 161-63]. Lobdell told Borowicz that his pain from the car accident worsened over time, and that he suffered from bulging discs in his spine. [Tr. 161]. He further described swelling between his shoulder blades, numbness in both hands, and difficulty sleeping. [*Id*.]. He also stated that medication was no longer relieving his shoulder, hip, or neck pain, and that he experienced increased pain when bending, lifting, and ambulating. [*Id*.]. Ultrasound therapy was applied to Lobdell's upper back area, and he requested to go home to rest before the treatment was completed. [Tr. 161-63]. He rated his neck and upper back pain at between seven and ten out of ten, and rated his low back pain between four or five out of ten. [Tr. 162]. Lobdell was instructed to undertake physical therapy three times per week for four weeks. [*Id*.]. On March 28, 2011, Lobdell ceased attending therapy at Quantum Physical Therapy after two sessions because he was "unable to attend . . . due to a lack of transportation." [Tr. 164].

Also on March 8, 2011, Lobdell sought pain management treatment from Dr. Jon Wardner. [Tr. 168-70]. Lobdell complained of severe pain in his hips, back, and shoulders; weakness, limited motion, balance issues, bladder problems; and impairments in his ability to work and care for himself. [Tr. 168]. He reported that numerous types of motion made his pain worse, as did maintaining a standing, sitting, or laying posture; he further alleged that nothing made his pain better. [*Id*.]. He again reported swelling in his feet, and both depression and anxiety. [Tr. 169]. However, Lobdell stated that he had just returned to work without restrictions. [*Id*.].

Lobdell underwent an MRI scan of his hip and shoulders at Saint Joseph Hospital on March 14, 2011. [Tr. 238-43]. Dr. Jacob Livermore interpreted the results of this test, finding

"mild acromioclavicular joint osteoarthritis with hypertrophic osteophyte formation which is partly inferiorly oriented causing very minimal mass effect on the anterior aspect of the supraspinatus musculotendinous junction," and evidence of "very minimal bursitis" of the right shoulder, but with no major irregularities.  [Tr. 238-39].  With regard to the left shoulder, Dr. Livermore similarly found evidence of mild bursitis and joint osteoarthritis.  [Tr. 241].  Finally, he found that Lobdell's right hip showed mild gluteus medius and hamstring origin tendinosis and no significant finding of osteoarthritis.  [Tr. 243].

On April 12, 2011, Dr. Wardner completed an evaluation of Lobdell's condition.  [Tr. 171].  He noted that an MRI of Lobdell's right hip demonstrated "minimal osteoarthritis and tendinosis," but that Lobdell "declined an arthrogram" of that joint.  [*Id*.].  An MRI of his shoulder showed "mild bursitis/tendonitis, with no rotator cuff tear," and "bilateral AC arthritis," but found that his condition was stable.  [*Id*.].  Dr. Wardner recorded that Lobdell "would rather not undergo any orthopedic intervention."  [*Id*.].  Lobdell again complained that his right hip caused him the most pain.  [*Id*.].  Dr. Wardner found that Lobdell's hip had no significant abnormalities; he noted that Lobdell cried during the hip examination, and that Lobdell's symptoms were "difficult to interpret because of the dramatic pain behaviors and guarding."  [Tr. 171].  With regard to Lobdell's shoulder condition, Dr. Wardner found that Lobdell complained of pain when lifting his arm above 90 degrees, but showed no substantial abnormalities.  [*Id*.].  Lobdell requested and was supplied with a small quantity of anti-anxiety medication, but shoulder injections were not applied pending a future bone scan.  [*Id*.].  Dr. Wardner concluded by stating that "I do not have a good explanation for Mr. Lobdell's severe right hip pain symptoms.  The MRI scan showed some mild abnormalities but nothing to explain his degree of pain."  [*Id*.].

On April 17, 2011, Lobdell visited Saint Joseph Hospital for a whole body bone scan for the purpose of diagnosing the cause of his severe right hip pain.  [Tr. 244-47].  Dr. John Freitas interpreted this scan, finding "no significant abnormalities . . . in the right hip to explain the patient's pain," but with "bilateral facet joint arthropathy at L3-L4 and the left side of L4-L5" which he found correlated with the MRI of Lobdell's hip performed on March 14, 2011.  [Tr. 244].

On May 25, 2011, Dr. Roderick Beer administered epidural injections to Lobdell's spine.  [Tr. 337-48].  Dr. Beer found that Lobdell suffered from chronic back and right leg pain, L5-S1 radicular symptoms, and bulging discs at L4-L5 and L5-S1.  [Tr. 337].

Dr. Wardner again examined Lobdell on June 7, 2011.  [Tr. 173-74].  Based on the bone scan, he referred Lobdell for lumbar injections, which Lobdell reported were "helping considerably" and "improved significantly" his comfort in bed.  [Tr. 173].  Lobdell also recounted intermittent swelling in both legs.  [*Id*.].  Dr. Wardner performed pain-relieving injections in Lobdell's right shoulder, and noted that he "did not have any new treatment ideas at this point."  [*Id*.].

On August 9, 2011, Dr. Wardner reviewed a Doppler study of Lobdell's legs, finding that it revealed no abnormal results.  [Tr. 230].  He also noted that Lobdell had undergone two lumbar epidural steroid injections, which temporarily relieved his hip pain; Lobdell reported experiencing pain that traveled from his hip downward into his right leg, producing cramping.  [*Id*.].  Dr. Wardner found that "[o]n examination, overall appearance is stable.  He is in no distress.  Affect is guarded.  He transfers from sitting to standing independently" and found no significant abnormalities upon examining Lobdell's hips and legs.  [*Id*.].  He concluded his report by stating that "I am not sure how to explain [Lobdell's] symptoms, but I feel obligated to

do something further diagnostically." [*Id.*].

Lobdell next visited Dr. Wardner on August 18, 2011. [Tr. 234-36]. He performed and interpreted a nerve conduction study and needle electrode myography, and found that Lobdell's condition was "[e]ssentially normal." [Tr. 234]. He further concluded that Lobdell's hip showed no radiculopathy or plexopathy, and that "there was no explanation for the right hip pain." [*Id.*]. However, he found that Lobdell was suffering from "some edema of both ankles and feet." [*Id.*].

On September 16 and 30, 2011, Lobdell visited Dr. Szaraz for a blood pressure check. [Tr. 261-67]. Lobdell complained of back pain, anxiousness, and fatigue, and was found to have hypertension. [*Id.*]. He was prescribed medication to treat his hypertension, anxiety, and pain; his blood pressure was substantially lower on the second visit. [Tr. 261].

Lobdell again visited Dr. Wardner on November 4, 2011, who again administered a shoulder injection. [Tr. 226-27]. Lobdell reported that the prior injection, administered approximately five months prior on June 6, 2011, had recently worn off, and he requested another injection. Dr. Wardner found that Lobdell could actively abduct the right shoulder about 60 degrees, at which point he reported pain. [*Id.*]. Dr. Wardner noted that he might provide another injection in three to four months, but did "not want to overdo these things." [*Id.*]. He suggested physical therapy pending Lobdell acquiring medical insurance.

On January 19, 2012, Lobdell was seen by Dr. Szaraz for complaints of swollen feet. [Tr. 255-60]. Dr. Szaraz found that Lobdell's feet did not show edema during his examination, but nonetheless instructed Lobdell to elevate his feet. [Tr. 255-56].

On February 2, 2012, Lobdell sought treatment from Dr. Wardner for shoulder pain. [Tr. 248-49]. Dr. Wardner found that Lobdell experienced pain upon moving his right arm beyond 90 degrees, but nevertheless declined to provide a third injection because "we will need to

consider the potential benefit/risk of further injections, beyond today." [Tr. 248]. He also noted

that Lobdell was still waiting on the results of a lawsuit related to his car accident, and that "once

things get resolved . . . they will let us know." [*Id.*].

Dr. Beer again treated Lobdell with epidural injections to his spine on April 12, 2012.

[Tr. 250]. Lobdell reported experiencing approximately two-and-one-half to three months of

relief from the prior epidural injection, and that his relief increased with subsequent injections.

[*Id.*]. Dr. Beer discussed the possibility of referral to a neurosurgeon, but Lobdell stated that his

insurance issues foreclosed that possibility. [*Id.*].

### b.     Consultative and Non-Examining Sources

On August 27, 2011, Lobdell's physical condition was evaluated by Dr. Sergey

Tsekhanov of Great Lakes Medical Evaluations. [Tr. 208-11]. Lobdell asserted that he

experienced pain from bending over for 20 minutes or walking 50 feet. [Tr. 208]. Lobdell

further stated that he required assistance to complete daily activities that require bending, like

putting on shoes and socks. [*Id.*]. He asserted that medication and treatments did not

significantly alter his pain level, and that he had difficulty sleeping through the night. [*Id.*]. Dr.

Tsekhanov noted a somewhat limited range of motion in Lobdell's shoulders and right hip, and

found that Lobdell was unable to perform a straight leg raise on the right side. [Tr. 210]. He

also found tenderness around the right hip, pain and numbness down the right leg, and a diffuse

muscle spasm on the right lower back. [*Id.*]. Dr. Tsekhanov similarly found that Lobdell had

difficulty getting on the examination table, and a limp favoring the right leg. [Tr. 211].

On September 22, 2011, Lobdell underwent a psychological consultative examination

performed by Dr. Thomas Horner. [Tr. 214-17]. Lobdell asserted that he plays cards with

friends and gets along well with neighbors and most people he meets. [Tr. 215]. Dr. Horner

found that Lobdell was genial, relaxed, articulate and polite.  [Tr. 215-16].  Dr. Horner diagnosed Lobdell with anxiety, and found that his prognosis was stable; he found that Lobdell's ability to relate to others, to understand, remember, and carry out familiar tasks, and to focus and sustain attention to relevant occupational tasks were intact, and that his ability to withstand the stresses of ordinary occupational activity was adequate.  [Tr. 216-17].

On October 26, 2011, Dr. Ashok Kaul, a state agency psychologist, completed a review of Lobdell's medical records and opined as to his mental impairments.  [Tr. 48-50].  While Dr. Kaul characterized Lobdell's anxiety as a "severe" impairment, he found that it resulted in only mild restrictions to his activities of daily living, social functioning, and maintaining concentration, persistence, or pace ("CPP"), and that his nonexertional[2] limitations would not significantly erode the occupational base.  [Tr. 49, 53].

### 3.    *Vocational Expert's Testimony*

Toni McFarland testified as an independent vocational expert ("VE").  (Tr. 40-41).  The ALJ asked the VE to assume a hypothetical individual of Lobdell's age, education, and work experience, and who has the following limitations: a sit/stand option; right arm may only be used for one-third of the workday; prohibited from overhead reaching with the right arm.  [*Id.*].  The VE testified that the hypothetical person would not be able to perform any of Lobdell's past work.  [*Id.*].  However, the hypothetical person would be able to perform the work of a surveillance systems monitor, of which approximately 100 jobs exist in the lower peninsula of Michigan.  [Tr. 41].

---

[2] Nonexertional limitations are defined as "certain mental, sensory, or skin impairments" or "impairments [which] result solely in postural and manipulative limitations or environmental restrictions."  20 C.F.R. Part 404, Subpt. P, App. 2, Section 200.00(e).  In contrast, exertional limitations are defined as impairments that affect a claimant's "ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)."  20 C.F.R. §404.1569a(b).

The ALJ next asked the VE to consider a more restrictive hypothetical, including the requirement that the worker be permitted to lay down for two hours out of an eight-hour workday. The VE testified that the inclusion of that restriction would preclude all work. [Tr. 41].

### C.      Framework for Disability Determinations

Under the Act, DIB is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21

(E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.     The ALJ's Findings

Following the five step sequential analysis, the ALJ determined that Lobdell was not disabled. [Tr. 11]. At Step One, she found that Lobdell had not engaged in substantial gainful activity between his alleged onset date, January 27, 2011, and his date last insured, September 30, 2011. [Tr. 13]. At Step Two, she found the following severe impairments: degenerative disc disease in the lumbar spine; mild tendinosis in the right hip; mild acromioclavicular joint osteoarthritis bilaterally; foot pain; minimal bursitis of the hips bilaterally; and anxiety disorder. [*Id.*]. At Step Three, she concluded that none of Lobdell's severe impairments, either alone or in combination, met or medically equaled a listed impairment. [Tr. 13-14]. In considering his impairments, she found that Lobdell had "moderate difficulties" in social functioning, and "mild difficulties" in CPP, but found that neither of these difficulties caused marked limitations. [Tr. 14]. The ALJ next assessed Lobdell's RFC, finding him capable of performing sedentary, unskilled work. [Tr. 15].

At Step Four, the ALJ found that, based on this RFC, Lobdell could not perform his past relevant work. [Tr. 19]. However, at Step Five, the ALJ concluded that, despite his nonexertional limitations, Lobdell was able to perform all or substantially all of the requirements of sedentary, unskilled work. [Tr. 20]. The ALJ noted that the Medical-Vocational Guidelines ("grids"), 20 C.F.R. Part 404, Subpart P, Appendix 2, provide a framework for determining

whether the claimant is disabled where he can "perform all or substantially all of the exertional demands at a given level of exertion." [Tr. 20]. The ALJ also noted that Lobdell's ability to perform those exertional demands "was impeded by additional limitations . . . . the claimant's residual functional capacity includes a limitation to unskilled work." [*Id*.]. However, the ALJ concluded that under the Social Security rules, such a limitation does not "significantly erode the occupational base of sedentary work," and thus the grids directed a finding that Lobdell was not disabled. [*Id*. quoting SSR 96-9p].

### E.   Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486

F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

Lobdell appears to challenge the ALJ's decision in four respects: 1) the RFC which the ALJ applied is inconsistent with the hypothetical questions she posed to the VE; 2) the number of jobs which the VE found Lobdell could perform was not a significant number, and thus required a finding of disabled; 3) the ALJ erred in relying on the grids to determine that Lobdell was not disabled, and should have instead relied upon the testimony of the VE to determine his disability status; and 4) the RFC applied by the ALJ was not supported by substantial evidence.

[15 at 8-14].  For the reasons discussed below, the Court rejects these arguments and finds that the ALJ's decision is supported by substantial evidence and should be upheld.

        1.      *Inconsistency of the RFC With the Hypothetical Questions Asked of the VE*

Lobdell first argues that the RFC applied by ALJ in rendering her decision was inconsistent with the hypothetical questions asked of the VE at the oral hearing, and was thus invalid.  However, an ALJ who seeks the assistance of a VE is not required to use the VE's testimony in rendering his or her decision.  *See Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006) ("the ALJ is entitled to evaluate the testimony of a vocational expert, the DOT, and other relevant evidence, but is not required to rely on any of these sources.").  Because the ALJ relied solely upon the grids and did not support her decision with VE testimony, any inconsistency between those hypothetical questions and the RFC applied in the decision is immaterial.  [Tr. 16-20].[3]

        2.      *Whether the VE Identified a Substantial Number of Jobs*

Lobdell also argues that the number of jobs which the VE identified in response to the ALJ's hypothetical questions do not constitute a "significant number" of jobs, and thus requires

---

[3] Lobdell also argues that the limitations found by the ALJ at Step Three should have been included in her questions to the VE, and that the ALJ's decision was deficient because the VE's testimony was based on improper hypothetical questions.  [15 at 13-14].  This argument misses the mark because, as just noted, the ALJ did not rely upon the VE's testimony in her decision. The ALJ found at Step Three that Lobdell suffered from moderate difficulties with social functioning, including a tendency to isolate himself and become irritable due to pain and anxiety, and mild difficulties with respect to CPP.  [Tr. 14].  However, an ALJ's conclusion regarding the claimant's limitations at Step Three does not necessarily inform the extent of limitations to be included in the RFC at Step Four.  *See Werkema v. Comm'r of Soc. Sec.*, No. 1:13-CV-646, 2014 WL 5035363, at *5 (W.D. Mich. Sept. 22, 2014); *Sebastian v. Comm'r of Soc. Sec.*, No. 1:13-CV-792, 2014 WL 5040574, at *4 (W.D. Mich. Sept. 24, 2014) (noting that a Step Three finding "was not an RFC finding made at step four"); *Pinkard v. Commissioner of Social Security Administration*, No. 1:13–cv–1339, 2014 WL 3389206 at *10 (N.D. Ohio July 9, 2014) (findings at step three of the sequential evaluation process . . . are not RFC findings pertaining to steps four and five of the sequential evaluation process.").  To the extent Lobdell is actually challenging the RFC set forth by the ALJ at Step Four, the Court discusses that issue below.

that either Lobdell be adjudged disabled or the case be remanded to the ALJ so that revised questions can be posed to the VE. [15 at 10-14]. Again, Lobdell has raised a non-issue. Regardless of whether the VE identified a significant number of jobs in the region, the ALJ did not rely upon the VE's testimony in rendering her decision, but instead relied solely upon the grids. Consequently, the VE's finding regarding the number of available jobs is immaterial to the validity of the ALJ's decision.

> 3.   *Whether Lobdell's Nonexertional Limitations Preclude the Use of the Grids*

Next, Lobdell argues that the ALJ erred by relying solely on the grids to reach a finding of not disabled. [15 at 13-14]. An ALJ may rely solely upon the grids only if the claimant's RFC findings coincide with all grid criteria. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a). Because the grids address only exertional impairments, the existence of significant non-exertional impairments mandates further analysis to determine whether those impairments will substantially reduce the base of occupations which the claimant can perform. *See Riley v. Comm'r of Soc. Sec.*, No. 12-10132, 2013 WL 1278344, at *8 (E.D. Mich. Feb. 22, 2013) report and recommendation adopted, No. 12-10132, 2013 WL 1278492 (E.D. Mich. Mar. 27, 2013). If the ALJ demonstrates "ample support in the record for the proposition that the significant nonexertional impairment at issue nonetheless only marginally reduces the occupational base," then the grids may nevertheless be used to find that claimant not disabled. *Andrews v. Comm'r of Soc. Sec.*, No. 08-CV-12296-DT, 2009 WL 1505791, at *7 (E.D. Mich. May 27, 2009); *see also Edwards v. Comm'r of Soc. Sec.*, No. 12-11789, 2012 WL 6962977, at *8 (E.D. Mich. Dec. 17, 2012) report and recommendation adopted, No. 12.-CV-11789-DT, 2013 WL 363018 (E.D. Mich. Jan. 30, 2013). As the Court discusses below, the ALJ properly noted ample evidence in the record supporting the conclusion that Lobdell could perform sedentary work, and that his

non-exertional limitations would have only a marginal impact on the occupational base which he can perform.  Thus, the ALJ's reliance on the grids was not erroneous.

### 4.   The RFC Applied by the ALJ is Supported by Substantial Evidence

The main thrust of Lobdell's argument relating to the ALJ's hypothetical questions and use of the grids is that the RFC was not supported by substantial evidence.  [15 at 9-14].  To this end, Lobdell argues that "removing plaintiff's shoulder limitations from the RFC in [the ALJ's] hearing decision was also error."  [15 at 14].  His assertions that the ALJ should have included limitations in her hypothetical questions related to the use of his right shoulder, moderate difficulties with social functioning, and mild difficulties with CPP are really challenges to the RFC.  [*Id.*].

Here, the ALJ thoroughly examined Lobdell's medical records, and the RFC she imposed, including omitting a shoulder use restriction, is supported by substantial evidence. Indeed, no doctor found that Lobdell would require any kind of reaching restriction.  The ALJ noted that Dr. Tsekhanov found only "slightly limited range of motion in the shoulders," and that he "did not provide an opinion of the claimant's functional ability . . . . his notes do not include any objective findings that would preclude the performance of sedentary work activity."  [Tr. 18].  Lobdell cites no authority stating that a finding of a slightly limited range of motion in a claimant's shoulder precludes sedentary work.  With regard to Dr. Wardner's findings, which stated that Lobdell was unable to lift his shoulder above 90 degrees, sedentary work generally does not require overhead reaching.  *See Miller v. Comm'r of Soc. Sec.*, No. 1:12-CV-00917, 2014 WL 1091018, at *1 (S.D. Ohio Mar. 18, 2014); SSR 85–15, 1985 WL 56857 at *7 (stating that only "significant limitations in reaching or handling" will eliminate a large number of occupations a person could otherwise perform).  Moreover, as the ALJ properly noted, Lobdell

reported to Dr. Wardner that injection treatments provided "good relief" for his shoulder. [Tr. 18, 173].

The ALJ also supported her decision by calling the credibility of Lobdell's reported symptoms into question, noting that Dr. Wardner regularly found that objective medical evidence could not explain Lobdell's complaints of severe hip pain. [Tr. 18, 171, 230]. Further supporting her decision, the ALJ found that Lobdell was able to return to work following his September 2010 motor vehicle accident, and that he suffered no acute injury or deterioration after January 2011 which would explain his complaints of disabling pain. [Tr. 16].

The ALJ's decision to not include social functioning limitations in the RFC is also supported by substantial evidence in the medical record. The ALJ found that no medical evidence indicated marked limitations in terms of social functioning, and that Lobdell reported normal social relationships with his wife and neighbors, and regularly socialized with friends. [Tr. 14]. The ALJ appropriately gave great weight to the findings of Dr. Horner, who found that Lobdell's ability to relate to others was intact, and that Lobdell would be "able and reasonably motivated to engage in work activity." [Tr. 19]. The ALJ also noted Dr. Kaul's findings, which similarly concluded that Lobdell suffered from only mild limitations to his activities of daily living, ability to maintain social functioning, and his CPP. [*Id*.]. While the ALJ gave limited weight to Dr. Kaul's opinion, this medical evidence nevertheless supports her finding that Lobdell's social functioning limitations do not significantly reduce the occupational base of work available.

The ALJ also appropriately noted that Lobdell has not sought out specialized medical treatment for his anxiety. [Tr. 19]. Furthermore, the ALJ found that a limitation to unskilled work takes into account Lobdell's complaints of anxiety, because such jobs involve limited

interpersonal contact.  [Tr. 19].

With regard to Lobdell's mild CPP limitations, substantial medical evidence again supports the ALJ's decision to not include a limitation in the RFC greater than "unskilled work." Lobdell himself reported no difficulties in terms of paying attention, following instructions, or handling stress [Tr. 141-42].  This was confirmed by Dr. Horner's findings that Lobdell's ability to understand, remember, and carry out familiar tasks and to focus and sustain attention to relevant occupational tasks were intact and operational.  [Tr. 216-17].

Finally, as the ALJ properly noted, the Social Security rules take administrative notice that "there are approximately 200 separate unskilled sedentary occupations, each representing numerous jobs, in the national economy."  [Tr. 20]; SSR 96-9p.  Because Lobdell's RFC permits him to perform unskilled sedentary work, he therefore necessarily is able to perform a significant number of jobs in the national economy.  This also further supports the ALJ's reliance on the grids in this case.  *See supra* at 17-18.

In sum, the ALJ's RFC is supported by substantial evidence in the record, and her use of the grids to find Lobdell not disabled was proper.

## III.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **[17]** be **GRANTED**, Lobdell's Motion **[15]** be **DENIED**, and the **ALJ's** decision be **AFFIRMED**.


Dated: March 10, 2015                          s/David R. Grand
Ann Arbor, Michigan                            DAVID R. GRAND
                                               United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.   *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 10, 2015.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager

21